# IN THE COURT OF APPEALS OF IOWA

No. 4-067 / 13-1496
Filed April 30, 2014

IN RE THE MARRIAGE OF BRIANNE MARIE RODGERS
AND WESTON DEAN RODGERS

Upon the Petition of
BRIANNE MARIE RODGERS,
    Petitioner-Appellant,

And Concerning
WESTON DEAN RODGERS,
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Warren County, David L.
Christensen, Judge.

A mother appeals a district court's award of physical care of children to
father. **AFFIRMED.**

Todd A. Elverson, Des Moines, for appellant.

Jenna K. Lain of The Law Office of Jenna K. Lain, P.L.L.C., Corydon, for
appellee.

Heard by Vogel, P.J., and Doyle and Mullins, JJ.

**MULLINS, J.**

Brianne Rodgers appeals from the district court's award of physical care to Weston Rodgers. Brianne argues she should be awarded physical care of their three children because she was the primary caregiver before the separation, the children would be stable if she were the primary caretaker, and Weston was the reason for Brianne's prior employment and residence instability. We affirm the district court's award to Weston.

## I. Background Facts and Proceedings

Brianne Rodgers and Weston Rodgers met while attending Kirkwood Community College in 2001. They were married in 2004. Brianne was a certified nurse's aide (CNA) in 2004. After a few years of being a CNA, Brianne went to massage therapy school for one year. In 2005, she returned to nursing school. Brianne obtained her Associate's Degree in Nursing in 2007. After she obtained her degree, Brianne worked as a registered nurse.

Weston obtained an Associate's Degree from Kirkwood and then graduated from Iowa State University with a double degree. Weston began working at People's Bank in 2005 and was offered a position in the loan department once he graduated from Iowa State University. Weston continues to work at People's Bank today.

Brianne and Weston have three children: K.R., born in 2008; L.R., born in 2010; and B.R., born in 2011. Brianne took three months of maternity leave after each child was born. Brianne suffered from postpartum depression after the births of K.R. and L.R., and she was treated with prescribed medication. After

K.R.'s birth, Brianne switched her work schedule to thirty-six hours over Saturday, Sunday, and Monday in order to stay home with K.R. Weston or his stepmother took care of K.R. when Brianne worked the weekend. When L.R. was nine months old, Brianne changed her schedule to work three weekdays so that she could attend more family functions on the weekends.

Weston's work schedule consisted of working at People's Bank from 8:00 a.m. until 5:00 p.m. weekdays. Weston also owned cattle and related farm equipment, which he would work with in the evenings after working at the bank. When Weston was working with the cattle, Brianne cared for the children.

B.R. was diagnosed with reactive airway disease in early 2012. When B.R. becomes ill with a virus, he develops asthma and breathing problems. Later in 2012, Brianne started a home daycare so that she could care for B.R. and give him breathing treatments when he needed them.

In August 2012 Brianne told Weston she wanted a divorce. In September 2012, Brianne advised her daycare clients she would be closing the daycare in October. Weston sold his cattle and farm equipment.

In September, Weston filed a petition for relief from domestic abuse. The alleged domestic abuse occurred in front of the daycare children. During a conversation about Brianne receiving text messages from her high school friend Matt, Weston started to walk away from Brianne. In order to stop him, Brianne grabbed Weston's shoulder or neck. Weston's petition for relief was granted, but the protective order did not provide which party would have possession of the marital residence or custody of the children.

After the temporary protective order was entered on September 18, Brianne and the children remained in the marital home while Weston stayed with friends or family. When Brianne and the children returned to the marital home on September 19 after getting groceries, Brianne noticed Weston's truck in the driveway. Brianne and the children went to the police station and advised them of the protective order. The police went to the marital home and handcuffed Weston until he showed them that he was the protected party in the protective order. Brianne continued to live in the marital home with the children after this September 19 incident.

The children spent the following weekend with Weston. The parties had scheduled the children to return to Brianne at the marital home on Sunday at 4:00 p.m. When Brianne arrived at the marital home on Sunday, she saw Weston's car in the garage. Brianne did not see the children or their belongings in the home, but Weston appeared and told her he called the police. When the police arrived, they determined Brianne would have to leave the marital home and Weston could reside there. Brianne went to stay at her cousin's house in Bondurant and called her daycare clients that night to advise them she did not have the home to finish her scheduled daycare. Weston dismissed the petition for relief from domestic violence before the permanent protective order hearing.

On October 8, 2012, Brianne filed for dissolution of marriage. Brianne then briefly moved to Montezuma. On October 21, at the end of a weekend visitation in Montezuma, Brianne told Weston she would not return the children to him. Two days later, Weston filed an application for an ex-parte temporary

custody order on October 23, 2012. The court ordered Brianne to return the children to Weston and assigned temporary parenting time.

In November, the court temporarily awarded the parties joint legal custody, Weston physical care and the marital home, and Brianne reasonable visitation. The order provided that if Brianne moved to Warren County, then her visitation would include every other weekend and Wednesdays overnight. Brianne moved to Norwalk in Warren County so she could see the children more often.

The district court held trial on the dissolution petition in July 2013. The court awarded the parties joint legal custody, Weston physical care, and Brianne liberal parenting time. Brianne appealed.

## II.    Standard of Review

We review dissolution of marriage cases de novo. *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). We do, however, give weight to the trial court's factual findings, especially determinations of credibility. *Id.* Appellate attorney fee awards are discretionary. *In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996).

## III.   Analysis

### A.  Physical Care

Brianne argues the trial court erred when it awarded Weston physical care of the children. Brianne asserts she was the children's primary caregiver before the separation, the children would be stable if she were the primary caretaker, and Weston is the reason for Brianne's prior employment and residence instability.

Physical care means "the right and responsibility to maintain a home for the minor child and provide for routine care of the child." *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007) (internal quotation marks omitted). If joint physical care is not warranted, the court must choose the primary caregiver who will be responsible for the child's routine care. *Id.* at 691. The parent who is not the primary caregiver will generally be given visitation rights. *Id.* Physical care is determined by what is in the best interests of the child. *Id.* at 695. The court's objective is to "place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity. *Id.*

To determine the children's best interests, we consider the following Iowa Code section 598.41(3) (Supp. 2012) factors:

a. Whether each parent would be a suitable custodian for the child.
b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
c. Whether the parents can communicate with each other regarding the child's needs.
d. Whether both parents have actively cared for the child before and since the separation.
e. Whether each parent can support the other parent's relationship with the child.
f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.
g. Whether one or both the parents agree or are opposed to joint custody.
h. The geographic proximity of the parents.
i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.
j. Whether a history of domestic abuse, as defined in section 236.2, exists. . . .
k. Whether a parent has allowed a person custody or control of, or unsupervised access to a child after knowing the person is

required to register or is on the sex offender registry as a sex offender under chapter 692A.

In addition to the statutory factors, we also consider the factors listed in *In re Marriage of Winter*, 223 N.W.3d 165, 166-67 (Iowa 1974):

1. The characteristics of each child, including age, maturity, mental and physical health.
2. The emotional, social, moral, material, and educational needs of the child.
3. The characteristics of each parent, including age, character, stability, mental and physical health.
4. The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
5. The interpersonal relationship between the child and each parent.
6. The interpersonal relationship between the child and its siblings.
7. The effect on the child of continuing or disrupting an existing custodial status.
8. The nature of each proposed environment, including its stability and wholesomeness.
9. The preference of the child, if the child is of sufficient age and maturity.
10. The report and recommendation of the attorney for the child or other independent investigator.
11. Available alternatives.
12. Any other relevant matter the evidence in a particular case may disclose.

Continuity of caregiving is often a primary factor of physical care considerations. *Hansen*, 733 N.W.2d at 696. The record shows prior to the parties' separation, Brianne took care of the children most of the time. Weston worked until 5:00 p.m. and most evenings would work on the farm while Brianne took care of the children. When Brianne was at work on the weekends, either Weston or his stepmother would care for the children. However, Brianne also testified that Weston did eat supper with the children and bathe them much of the time. Even though Weston was not as involved with the children as Brianne

before the separation, Weston has become the primary caregiver for the children since. Weston sold his cattle and farm equipment and has scheduled his work day so that he can transport K.R. from school to daycare in the afternoons. Weston has at times gone to eat lunch with the children at school or daycare, checks on the children through texting the babysitter, and is able to leave work immediately if one of the children is ill.

Another primary consideration in physical care is stability. *Id.* The district court found Weston and his home to be stable and that there may be adverse effects on the children if the current custodial arrangement is disrupted. If Brianne is granted physical care, the children would move to a different town, a different school, and their daily routine would change. Stability is a particularly important consideration for K.R. K.R. was at times clingy or would cry when she was dropped off at school, became quiet and anxious after the separation, but has returned to her usual self, and is a very structured child that likes to know her schedule each day (i.e., what time she will be transported, who will be transporting her, etc.). Weston has been working for the same bank and has had a consistent schedule since 2005. Weston arranged his schedule so that he transports K.R. to daycare after school. Brianne has changed career paths a number of times since she and Weston met. She has also changed her work schedule multiple times in order to spend the most time with the children. Brianne testified that she currently works twelve hour shifts (7:00 a.m. until 7:00 p.m.), but her manager has agreed to allow Brianne to work eight hour shifts instead, working 7:00 a.m. until 3:30 p.m. If Brianne needs help transporting the

children, she stated her boyfriend and cousin are able to assist. Overall, Weston's employment record and schedule has been more stable than Brianne's. However, some of this is due to the fact that Brianne was trying to be with her children as much possible.

Weston alleges that his character, health, and personal stability are superior to Brianne's. At the trial, there were witnesses attesting to both Weston's and Brianne's good character and parenting. The record also shows Brianne's mental health struggles. Brianne suffered from postpartum depression after at least two of the children's births. She was prescribed medication and was always able to care for the children during her depression. Consequently, we place little significance to these facts in our review. Somewhat more troubling, however, is that Brianne admitted to having told Weston several times that she was going to kill herself. Brianne explained that she "may have said that when [she] was extremely frustrated or stressed out but [she] never intended it." Even if Brianne never intended to commit suicide, it is concerning that she would threaten to kill herself when she was frustrated.

After reviewing the entire record, we agree Weston should be the care provider for the children. Even though Brianne may have been more involved with the children before the separation, Weston has since increased his time spent with the children and has shown he is also successful at being the primary caregiver. While we do not endorse Weston's selfish manipulation of circumstances that were apparently for the purpose of gaining an upper hand during the early course of the proceedings, we have considered all the evidence,

giving deference to findings made by the district court. K.R.'s interests are best met with a consistent schedule. Weston's employment and schedule has been consistent, and the children are stable with their current custodial care schedule. The children maintain a good relationship with both parents, especially since Weston allows Brianne to be with the children more than her scheduled parenting time. The district court's physical care determination is affirmed.

### B. Attorney's Fees

Brianne asks this court to award her appellate attorney fees and tax all costs to Weston. Weston argues this appeal was frivolous and he should be awarded fees instead. Awards of appellate attorney fees are in the court's discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). The factors courts consider include "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). The district court found Weston's gross income is $20,000 higher than Brianne's. Yet, Brianne appealed the custody determination, and we are affirming in favor of Weston. While Brianne's argument did not ultimately prevail, her claim was not frivolous. Because Weston has a better ability pay his fees and also won the appeal, each party is responsible for his or her own attorney fees. Costs of this appeal are assessed to Brianne.

**AFFIRMED.**